## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

THELMA E. WARREN,                              Civil No. 04-1708 (RHK/JSM)

      Plaintiff,

v.                                             **REPORT AND**
                                               **RECOMMENDATION**

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

The above matter is before the undersigned United States Magistrate Judge on Plaintiff's Motion for Summary Judgment [Docket No. 12] and Defendant's Motion for Summary Judgment [Docket No. 19]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment [Docket No. 12] be denied and defendant's Motion for Summary Judgment [Docket No. 19] be granted.

## I.  PROCEDURAL BACKGROUND

Plaintiff applied for Supplemental Security Income (SSI) benefits on October 24, 2001, alleging she became disabled on August 15, 2000 due to mental illness, chemical dependency and severe depression. (Tr. 59-62, 77-86).[1]

---

[1]  At the time plaintiff applied for benefits, apparently she also complained of pain to her hip, knee, low back and neck. However, her primary claims to disability are based on mental health limitations. (Tr. 121).

The Social Security Administration ("SSA") denied plaintiff's application initially and upon reconsideration.  (Tr. 17-33, 77-86).  Plaintiff then filed a request for a hearing and on January 22, 2003, a hearing was held before Administrative Law Judge ("ALJ") Diane Townsend Anderson.  (Tr. 42-43, 358).  On June 3, 2003, the ALJ issued a decision to deny plaintiff benefits.  (Tr. 17-33).  Plaintiff requested review from the Appeals Council.  (Tr. 16).  On April 5, 2004, the Appeals Council denied plaintiff's request  (Tr. 7-10).  Denial of review by the Appeals Council made the ALJ's decision the final decision of the Commissioner in this case.  (Tr. 7-10).  See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for Summary Judgment [Docket No. 19].

After filing her Motion for Summary Judgment, plaintiff subsequently filed another application for SSI and was approved for SSI disability benefits.  Therefore, the question before the Court concerns the time period between October 2001 and June 2004.  Plaintiff's Reply Mem., at 2.

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least 12 months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process in Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994):

> The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled. The fourth step asks if the claimant's impairments prevent [him] from doing past relevant work. If the claimant can perform past relevant work, [he] is not disabled. The fifth step involves the question of whether

the claimant's impairments prevent [him] from doing other work.  If so, the claimant is disabled.

### B.    Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1492.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.    Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exceptional and non-exertional activities and impairments.

5.  Any corroboration by third parties of plaintiff's impairments.

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C.

§ 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a),

416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant

has demonstrated he or she cannot perform prior work due to a disability, the burden of

proof then shifts to the Commissioner to show that the claimant can engage in some

other substantial, gainful activity.  Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir.

1985).

## III.  DECISION UNDER REVIEW

### A.    The ALJ's Findings of Fact

Plaintiff alleges that she is not able to work due to mental illness, chemical

dependency, severe depression, anxiety, a personality disorder, headaches, and hip,

knee, low back and neck pain.  (Tr. 20).

The ALJ concluded that plaintiff was not disabled and was not eligible for

Supplemental Security Income under sections 1602 and 1614(a)(3)(A) of the Social

Security Act.  (Tr. 22).  The ALJ stated that she made the following findings based on

the entire record:

1. The claimant has not engaged in substantial gainful activity at any time relevant to this adjudication.

2. The medical evidence establishes the claimant is severely impaired by headaches, degenerative joint disease of the right knee, obesity, depression not otherwise specified, anxiety, a borderline personality, and polysubstance abuse.

3. The claimant does not have an impairment or combination of impairments that meets or is medically equal to an impairment found in the Listing of Impairments at 20 C.F.R. Subpart P Appendix 1.

4. The claimant retains the residual functional capacity to perform tasks involving lifting twenty pounds occasionally and ten pounds frequently, and only occasional bending, stooping, twisting, crouching, crawling or climbing, but no climbing of heights, ladders or scaffolding, and is limited to routine and repetitive tasks involving brief and superficial contact with others, in a low to moderate stress environment with low to moderate production standards.

5. The claimant's allegations of functional limitations are credible to the extent that the impairments could reasonably cause some limitation in function.  However, the allegation of total disability is not credible due to inconsistencies in the record as a whole.

6. The claimant is a younger individual at all times relevant to this adjudication, with a high school education.

7. The claimant has past relevant unskilled, light exertional-level work as a restroom attendant, housekeeper/cleaner, and cashier.

8. The claimant is able to perform her past relevant work as a restroom attendant and housekeeper/cleaner, as these jobs are customarily performed in the national economy.

9. Considering the claimant's residual functional capacity, age, education and relevant work history, she is able to perform other jobs existing in significant numbers in the national economy, examples of which include assembler and packager.

10. The claimant has not been under a disability, as defined in the Social Security Act, at any time relevant to this adjudication.

(Tr. 32-33).

## B.    The ALJ's Application of the Five-Step Process

In reaching his findings, the ALJ made the following determinations under the five-step procedure.  (Tr. 20-33).  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since she filed her application for supplemental security income.  (Tr. 21).

At the second step, the ALJ found that plaintiff was severely impaired by headaches, degenerative joint disease of the right knee, and obesity.  (Tr. 21).  The ALJ also found that plaintiff was subject to depression not otherwise specified, anxiety, a borderline personality, and polysubstance abuse.  (Tr. 22).  The ALJ found that the combination of the impairments resulted in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and one episode of decompensation

7

related to the claimant's substance abuse.   (Tr. 22).   At the third step, the ALJ determined that plaintiff's impairments did not meet, or medically equal, singularly, or in combination, any listed impairments of the Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4.  (Tr. 32).

At the fourth step, the ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform tasks involving lifting twenty pounds occasionally and ten pounds frequently, and only occasional bending, stooping, twisting, crouching, crawling or climbing, but no climbing of heights, ladders or scaffolding.  (Tr. 25).  The ALJ also found, with respect to plaintiff's mental impairments, that plaintiff is limited to routine and repetitive tasks involving brief and superficial contact with others, in a low to moderate stress environment with low to moderate production standards.  (Tr. 25).  Therefore, the ALJ found that plaintiff could perform the duties of her past relevant work as a restroom attendant and housekeeper/cleaner, as these jobs are customarily performed in the national economy.  (Tr. 31).

At the fifth step, the ALJ found that even if plaintiff were not able to perform the duties of these jobs, and the burden shifted to the government to show any other work that she can perform given her age, education, relevant work history, and residual functional capacity, plaintiff could perform a significant number of other jobs, including assembler and hand packager.  (Tr. 31).

## IV.  ISSUES UNDER REVIEW

On appeal, plaintiff contends the ALJ erred because: (1) there is not substantial evidence in the record to support the ALJ's decision to disregard the opinion of plaintiff's treating psychologist and rely entirely on non-treating, non-examining sources; (2) the ALJ's conclusions under Part B of the listing criteria are unsupported by substantial

evidence; and (3) the opinion of the Vocational Expert is not supported by substantial evidence because it was based on a legally defective hypothetical.  In her motion for summary judgment, plaintiff asked this Court to reverse the final decision of the Commissioner of Social Security ("Commissioner") and award benefits, or in the alternative, to remand the matter back to the Commissioner for further proceedings consistent with proper legal principles.

In her cross-motion for summary judgment, the Commissioner asked this Court to deny plaintiff's motion for summary judgment and affirm the decision of the Commissioner denying plaintiff's claims for disability benefits.

## V.    ANALYSIS

As set forth above, the second and third steps of the five-step analysis performed by the ALJ, require the ALJ to initially determine if the claimant has an impairment or combination of impairments that significantly limits her ability to do basic work activities, and then, if so, to determine whether the impairments meet or equal a listed impairment. If the impairments do meet or equal a listed impairment, the claimant is disabled; if they do not, then the ALJ proceeds on to Step 4, and if necessary, to Step 5 of the five-step analysis.  Here, the ALJ found that plaintiff dd suffer from several severe physical impairments—headaches, degenerative joint disease of the right knee, and obesity— but that none of these impairments alone or in combination with each other, met or equaled an impairment found in the Listing of Impairments at 20 C.F.R. Subpart P Appendix 1.  Further, the ALJ found that plaintiff suffered from four different mental impairments under the Listing of Impairments—depression not otherwise specified, anxiety, a borderline personality, and polysubstance abuse.  Nonetheless, based upon the opinions of the testifying independent medical expert (ME), Dr. Hoberman, the

findings of the State agency consultants, and the record as a whole, the ALJ concluded these impairments did not meet or medically equal, singularly, or in combination, any listed impairments of the Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4. The ALJ reached this conclusion because she found that the combination of these impairments resulted only in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and one episode of decompensation related to the plaintiff's substance abuse.

Plaintiff's appeal centers on the ALJ's finding that plaintiff's mental impairments did not meet or equal the level of severity required for a finding of disability. Specifically, plaintiff argues that the ALJ placed undo weight on the opinions of Dr. Hoberman, the ME, and the State agency consultants regarding the severity of plaintiff's medical impairments, and instead should have accepted and relied upon the opinions of plaintiff's treating psychologist, Louise Quinn, who found that plaintiff was markedly impaired on activities of daily living and in maintaining concentration, persistence, and pace, and extremely impaired on social functioning. Accordingly, plaintiff argues that had the ALJ given the proper weight to Ms. Quinn's opinions, a finding of disability at Step 3 would have been required. Further, plaintiff argues that by relying on Dr. Hoberman's opinions about plaintiff's ability to work, the ALJ presented an improper hypothetical based on a flawed RFC to the vocational expert. Thus, the thrust of plaintiff's appeal focuses on the weight given by the ALJ to the opinions of Dr. Hoberman, over Dr. Quinn, in light of the record as a whole.

A.     **Weight Given by the ALJ to the Opinions of the ME, State Agency Consultants and Plaintiff's Treating Physician**

Plaintiff challenges the ALJ's reliance on Dr. Hoberman, the independent medical examiner, and the findings of the State agency consultants in connection with her finding that plaintiff's severe impairments did not meet or equal an impairment found in the Listing of Impairments, at 20 C.F.R. Subpart P Appendix 1, and in connection with the development of the RFC used in the hypotheticals presented to the VE.   In this regard, the ALJ stated that in evaluating the limitations stemming from plaintiff's impairments, she gave great weight to the opinion of Dr. Hoberman, the ME, "because he has knowledge of the disability evaluation process, reviewed the evidence, listened to the hearing testimony and is a Licensed Psychologist with a doctorate degree."  (Tr. 25).  She also granted significant weight to the findings of the State agency consultants made at the initial and reconsideration determination levels, because their findings were consistent with the opinion of Dr. Hoberman and the record as a whole, and because they too have knowledge of the disability evaluation process.  Id.[2]  With respect to Ms. Quinn's opinions, the ALJ acknowledged that the opinion of the treating professional is generally entitled to significant weight, but that she rejected Ms. Quinn's functional limitations and her opinion that plaintiff would be absent from the workplace more than 3 times per month because the limitations set by Ms. Quinn were unsupported by the evidence as a whole, and were inconsistent with the opinion of the ME.  (Tr. 26).

Plaintiff asserts that there is no support for the ALJ's claim that the ME's doctorate level degree automatically grants his non-examining opinion greater weight

---

[2]     In reaching that conclusion, the ALJ acknowledged that the consultants did not have the benefit of hearing the testimony or the medical records generated after their reviews.  (Tr. 25).

than that of a long time treating therapist.  Plaintiff's Mem., at 11.  Similarly, plaintiff asserts that the ALJ's assertion that because the ME "has knowledge of the disability process," his opinion should have more weight is without authority in the law.  According to plaintiff, such a rationale could be applied to elevate Social Security consultants over treating sources in any case and its use would wholly undermine the mandate established by the regulations and the Eighth Circuit to defer to the opinion of treating medical sources.  Id.

Plaintiff asserts that the regulations detail what factors must be considered when assessing the severity level of functioning of each mental health impairment in the Listing of Impairments, 20 C.F.R. pt. 404, subpt P, app. 1, Listing § 12.00, and that Ms. Quinn's mental impairment evaluation is consistent with and supported by her detailed treatment records that describe the precise type of information called for by the regulations.  Plaintiff's Mem., at 11-12; Tr. 304-09.  In this regard, plaintiff argues that, having treated plaintiff for nearly two years[3] at the time the evaluation was prepared and having seen plaintiff approximately two times per month over the previous year, Ms. Quinn was far more qualified, under Social Security law, to offer an opinion about the severity level of plaintiff's functioning than a non-treating, non-examining medical expert.  Id. at 12.  As such, plaintiff concludes, Ms. Quinn's opinion that plaintiff met the

---

[3]    Plaintiff claims that Ms. Quinn began treating plaintiff in May 2001.  In fact, plaintiff's first contact with Ms. Quinn was on May 21, 2001, when plaintiff phoned the United Family Practice Center clinic to talk to a counselor because she was feeling depressed about her phone being turned off.  (Tr. 196).  Quinn made an appointment with plaintiff, but plaintiff failed to show.  (Tr. 196, 209).  Quinn did not start treating plaintiff until January 4, 2002, approximately one year before the hearing.  (Tr. 196, 304).

criteria of listings under 12.04,[4] 12.06,[5] and 12.08[6] is entitled to controlling weight as a matter of law.[7]

In response, defendant argues that the ALJ reasonably rejected Ms. Quinn's opinion and credited Dr. Hoberman's opinion because, unlike Ms. Quinn, Dr. Hoberman reviewed all of the record evidence, listened to plaintiff testify, held a doctorate degree, and was familiar with the disability evaluation process.   Defendant's Mem., at 4. Defendant further argues that plaintiff's assertion that her one-year treatment relationship with Ms. Quinn overrode such considerations is unsupported.   Id.

The weight to be given to the opinions of various medical professionals in connection with the evaluation of severe impairments to determine if they meet or equal an impairment found in the Listing of Impairments, at 20 C.F.R. Subpart P Appendix 1, and in connection with the development of the RFC, is expressly addressed in 20 C.F.R. § 416.927.

---

[4]     This listing is entitled "Affective Disorders."   Such disorders are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.   Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elations."   20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04.

[5]     This listing is entitled "Anxiety Related Disorders."   "In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06.

[6]     This listing is entitled "Personality Disorders."   "A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress.   Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.08.

[7]     Plaintiff's objection to the ALJ's decision is limited to plaintiff's mental capacity.

While it is true, as a general proposition, controlling weight is given to medical opinions from treating sources on the nature and severity of a claimant's impairments, (providing that they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record), the SSA also considers other relevant factors in determining how much weight to give an opinion, such as consistency with the record as a whole, expertise of the source, and "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant." See 20 C.F.R. §§ 416.927(d)(2), (4), (5), (6).

Further, while the SSA will consider the opinions from medical sources, including treating physicians, on the issue of whether a claimant is disabled, whether the claimant's impairments meet or equal the requirements of any impairments in the Listing of Impairments, the claimant's RFC, or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner. See 20 C.F.R. § 416.927(e)(1), (2).   Consequently, the SSA does not give any special significance to the source of an opinion on those issues.   20 C.F.R.  § 416.927(e)(3); Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the determination whether an individual's impairment reaches listing level is not an issue in which the opinion of a treating source is given controlling weight); Jacobson v. Shalala, No. 93-4033, 1994 WL 525055, at *2 (8th Cir. Aug 17, 1994) (finding medical equivalency is decided by Commissioner without special deference to treating physician's opinion); Soc. Sec.

Ruling 96-5p ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight.").

With respect to opinions of non-examining sources, the SSA applies the following rules with respect to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts consulted in connection with administrative law judge hearings:

> (1) At the initial and reconsideration steps in the administrative review process, except in disability hearings, State agency medical and psychological consultants are members of the teams that make the determinations of disability. A State agency medical or psychological consultant will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in Appendix 1 to subpart P of part 404 of this chapter, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

> (2) Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

>> (i) Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether you are disabled. See § 416.912(b)(6).

>> (ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law

judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, . . .

(iii) Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to subpart P of part 404 of this chapter. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (e) of this section.

20 C.F.R. § 416.927(f).  See also 20 C.F.R. § 416.920(e)(3)(discussing retention of the services of a medical expert to assist the ALJ in determining severity of claimant's mental impairments and degree of limitation in each of the functional areas).

Thus, under regulatory framework governing disability determinations, not only is it contemplated that the ALJ will consult with an independent medical expert and consider the opinions of the State agency consultants on issues related to the nature and severity of the claimant's impairments and whether those impairments equal the requirements of any impairment set forth in the Listing of Impairments, but no special weight is given to the opinions of the treating physician on these issues or on the RFC. Additionally, in determining how much weight should be assigned to a particular medical source, consideration of the source's understanding of the SSA's disability programs and the extent to which the source is familiar with the other information in the case record are relevant factors.

Consequently, this Court rejects plaintiff's argument that the ALJ should have accorded great or controlling weight to Ms. Quinn's opinions regarding extent of the functional limitations to be placed on plaintiff, simply because she was plaintiff's treating physician.  Her opinions on whether plaintiff's severe impairments met or equaled an

impairment found in the Listing of Impairments, like the opinions of the other medical sources in this case, was entitled to no special or differential treatment.

### B.     Part B of the Listing Criteria

Under Listings 12.04, 12.06, and 12.08, the required level of severity for disorders is met, such that a person will be deemed to be disabled, if the description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(A).  Here, plaintiff challenges only the ALJ's findings as to the Part B factors.  Plaintiff's Mem., at 12.

In order to found to be disabled, plaintiff must meet any two of the four requirements under 12.04, 12.06, and 12.08 Part B.  The four requirements are:

1.     Marked restriction of activities of daily living; or
2.     Marked difficulties in maintaining social functioning; or
3.     Marked difficulties in maintaining concentration, persistence, or pace; or
4.     Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06, 12.08.

A "marked" limitation, when used as a standard for measuring the degree of limitation, means "more than moderate but less than extreme."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  Id.  "The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each

lasting for at least 2 weeks."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(4) (emphasis in original).

Plaintiff argues that the ALJ's analysis of the record and testimony is wholly based on that of the ME, but the ME's opinion is not supported by substantial evidence in the record and relies on improper legal interpretation of what is needed to establish a "marked" severity level in the Part B factors of the mental health listings.  Plaintiff's Mem., at 12.  Plaintiff argues that the ALJ and the ME made errors in three Part B factors—activities of daily living, social functioning, and concentration, persistence, or pace.[8]  Id.

---

[8]     Plaintiff states in a footnote that Ms. Quinn noted that plaintiff had three episodes of decompensation, each of extended duration.  See Plaintiff's Mem., at 12 n.3 (citing Tr. 308).   Ms. Quinn never indicated what constituted the three episodes of decompensation in her report.  (Tr. 304-09).  However, the ME stated that plaintiff only had at least one period of some kind of decompensation, but it appeared to be predominately related to substance abuse.  (Tr. 388).

"Episodes of decompensation" are defined as:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

> The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes

In response, defendant argues that the ALJ reasonably credited Dr. Hoberman's opinion because it was consistent with and supported by the record as a whole. Defendant's Mem., at 7.

In order to determine whether the ALJ's determinations with respect to the B criteria were supported by the record as a whole, it is necessary to review not only the opinions of Ms. Quinn, but to examine the record that formed the basis for the ME's opinions and upon which the ALJ relied for her determination.

### 1.   Opinions of Plaintiff's Treating Psychologist, Ms. Quinn

Plaintiff's first contact with Ms. Quinn was on May 21, 2001 when plaintiff phoned the United Family Practice Center clinic to talk to a counselor because she was feeling depressed about her phone being turned off.   (Tr. 196).   Ms. Quinn made an appointment with plaintiff, but plaintiff failed to show.  (Tr. 196, 209).  Ms. Quinn did not start treating plaintiff until January 4, 2002.  (Tr. 196, 304).   After two sessions, on February 20, 2002, Quinn diagnosed plaintiff with Depression, Recurrent, Moderate; Anxiety Disorder (NOS); Mixed Personality Disorder (NOS) with paranoid, antisocial, borderline and dependent characteristics; and a Global Assessment of Function score

---

within 1 year, or an average of once every 4 months, each
lasting for at least 2 weeks.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(4) (emphasis in original).

Plaintiff asserts that neither source was asked to identify the incidents in question and therefore argues that the Court should either reverse the Commissioner's decision outright, or remand so the issue of decompensation can be further developed. However, the claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the ME testified there was evidence of only one episode of decompensation, in order to meet her burden of proving that she was disabled, it was incumbent upon plaintiff to present evidence to support Ms. Quinn's conclusory note that plaintiff had suffered from three episodes in one year.

(GAF) of 55.[9]  (Tr. 199).  At that time, plaintiff was taking Prozac[10] once a week.  (Tr. 199).

In Ms. Quinn's February 20, 2002 report, she stated that plaintiff was "seeking counseling because her MFIP welfare benefits will expire in 6 months" and that "her current participation in counseling seems to be related to her remaining 5-month eligibility to receive" these benefits.  (Tr. 196, 198).  Under the heading "Mental Status Exam," Ms. Quinn noted that plaintiff was fully oriented.  (Tr. 198).  Plaintiff arrived on time to her appointment and she and her two girls (ages four and five) were dressed appropriately.  (Tr. 198).  Plaintiff failed to bring toys or activities to occupy the girls.  (Tr. 198).  The four-year-old child vomited during the exam and plaintiff's initial reaction was anger.  (Tr. 198).  Plaintiff's general mood towards her girls was exasperation and irritability.  (Tr. 198).  Plaintiff's mood during the session was demanding, mood neutral, affect irritable and angry.  (Tr. 198).  Plaintiff's thought processes were lucid and her content of thought demonstrated a suspiciousness of other people.  (Tr. 198).  Plaintiff's concentration and intelligence appeared to be within the normal range, though not tested during the interview, but her insight and judgment seemed to be fair to poor.  (Tr. 198).

Ms. Quinn noted that plaintiff had not had a suicide attempt since her teens and when she did feel suicidal in November, she called the crisis line.  (Tr. 198).  Plaintiff

---

[9]     The GAF scale is used to assess an individual's overall level of functioning. Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).  The lower the score, the more serious the individual's symptoms.  See id.  "GAF scores of 51-60 indicate 'moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  Id.

[10]     Prozac is prescribed for depression.

indicated that she socialized with people in her apartment complex, where she had lived for five years, but she did not socialize with them after the September 11, 2001 terrorist attacks. (Tr. 197). At that time, plaintiff was attending job training, which required her to leave the house in the morning and use public transportation. Id. Plaintiff indicated that she was becoming less fearful and feeling better with such requirements. Id.

Plaintiff stated that she had participated in counseling with therapist Marilyn Bronner from August through November 2001, but that she had quit because Bronner was too judgmental. (Tr. 197). Plaintiff also reported to Ms. Quinn that she had four jobs in her life, three of which lasted for a month. The last job, at the State Fair, lasted for 5 months. Plaintiff quit after the Secret Service refused to let plaintiff shake Vice President Gore's hand and put her in a room by herself. (Tr. 198).

On January 13, 2003, Ms. Quinn filled out a Mental Impairment Questionnaire. Ms. Quinn's diagnosis was the same as her diagnosis in February 2002, but at that time Ms. Quinn indicated that plaintiff's GAF was 45.[11] (Tr. 304). Ms. Quinn reported that plaintiff was living in a shelter with her two daughters, ages five and six, and she was pregnant. Id. Quinn noted that plaintiff receives no financial or emotional support from any of the children's fathers, she has no friends, and is in frequent conflict with her mother. Id. Quinn also provided an example of plaintiff's thinking—last fall a sixth grade girl who attended the same school as plaintiff's first grade daughter died of non-contagious medical causes. Id. As a result, plaintiff concluded that she should send her daughter to another school. Id.

---

[11]   GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).

Ms. Quinn also reported that plaintiff scored 42 on a Beck Depression Inventory screening and that anything over 29 falls into the severe category.  (Tr. 273, 305). Quinn reported that in 1995-96 had an IQ of 84, but her subscore in comprehension, insights relating to social events, was in the 5th percentile.  (Tr. 305).  As of January 2003, plaintiff was taking 40 mg of Prozac per day, 50 mg of Ultram[12] per day, and 500 mg of Napoxim[13] per day.  Ms. Quinn stated that plaintiff had no side effects to any of the medication.  (Tr. 305).

Ms. Quinn answered questions regarding plaintiff's ability to work.  She stated that plaintiff's impairments or treatment would cause her to be absent from work more than three times per month.  (Tr. 306).  When assessing plaintiff's mental abilities and aptitude needed to do unskilled work, Ms. Quinn noted that plaintiff's abilities were "Unlimited or Very Good" to be aware of normal hazards and take appropriate precautions.  Ms. Quinn rated plaintiff's abilities "Good" to: (1) remember work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) maintain attention for two-hour segments; and (5) perform at a consistent pace without an unreasonable number and length of rest periods.  Ms. Quinn rated plaintiff's abilities as "Fair" to: (1) work in coordination with or proximity to others without being unduly distracted; (2) make simple work-related decisions; (3) ask simple questions or request assistance; (4) respond appropriately to changes in routine work setting; and (5) deal with normal work stress.  Ms. Quinn stated

_____

[12]    Ultram is a non-narcotic pain reliever prescribed for mild to moderate pain.  The Pill Book 1075.

[13]    Ms. Quinn's notes indicate that plaintiff is taking Napoxim.  The Court assumes that Ms. Quinn meant Naproxen.  Naproxen is a "[n]onsteroidal anti-inflammatory drug." The Pill Book 735.

that plaintiff's abilities were "Poor or None" to: (1) maintain regular attendance and be punctual within customary, usually strict, tolerances; (2) sustain an ordinary routine without special supervision; (3) complete a normal work-day and work-week without interruptions from psychologically-based symptoms; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 306-07).

With respect to plaintiff's mental abilities and aptitudes to perform semi-skilled and skilled work, Ms. Quinn rated plaintiff as follows: plaintiff's abilities were "Fair" to understand and remember detailed instructions and to carry out detailed instructions; plaintiff's abilities were "Poor or None" to set realistic goals or make plans independently of others and to deal with stress of semi-skilled work. (Tr. 307).

With respect to plaintiff's abilities and aptitudes to do particular types of jobs, Ms. Quinn stated that plaintiff had "Unlimited or Very Good" ability to adhere to basic standards of neatness and cleanliness; a "Fair" ability to maintain socially-appropriate behavior; and "Poor to None" ability to interact appropriately with the general public, travel in unfamiliar places, and to use public transportation. (Tr. 307-08).

Ms. Quinn also rated plaintiff's degree of functional limitations on the Mental Impairment Questionnaire. Ms. Quinn checked "Marked" limitations in regard to "restrictions of activities of daily living," and "difficulties in maintaining concentration, persistence, or pace"; three "episodes of decompensation, each of extended duration"; and "Extreme" limitations regarding "difficulties in maintaining social functioning." (Tr. 308).[14]

---

[14]     On November 6, 2003, after the ALJ's decision, Ms. Quinn updated her January 13, 2003 report. (Tr. 340-42). In that report, Ms. Quinn summarized various incidents that had occurred prior to the hearing, including the fight plaintiff had with a woman who

**C.    The Record Before the ALJ**

In an undated report, presumably from the 1995-1996 time period,[15] Mary Frey and Dr. Virginia Vogel of the Hamm Clinic, diagnosed plaintiff with a Mood Disorder with Psychotic Features, Alcohol Dependence, in early, partial remission, Cannabis Dependence with physiological dependence, Paranoid Personality Disorder, Borderline Personality Disorder, Antisocial Personality Disorder, and a GAF of 45 with a high of 78. (Tr. 151-52).

---

lived in her apartment complex in August 2002, the loss of her apartment in October 2002, as a result of that fight, and plaintiff's subsequent moving around, living in two women's shelters, with her mother, and with her sister.  (Tr. 340).  Ms. Quinn stated that plaintiff had been kicked out of one shelter due to personality conflicts with other residents, and while she lived with her mother, the police were called several times because the two fought.  Id.  Plaintiff also became pregnant by a man she hardly knew in September 2002 and the baby was born in May 2003.  The father has provided no financial or emotional assistance to plaintiff.  Ms. Quinn also stated that plaintiff had not used alcohol or marijuana during or after the pregnancy.  Id.

Ms. Quinn also described an incident with plaintiff's OB-GYN in June 2003.  Plaintiff was looking forward to taking Ultram again after her pregnancy, but her doctor, Dr. Inoue, stated that reinstating the medication would not be advised.  Plaintiff became highly distraught and terminated the office visit early and loudly and stormed out of the office with her 2.5-week-old baby.  Plaintiff was so distraught that she left the baby unattended in a baby seat on the steps in front of the clinic while she went back inside to call to order her medical ride pickup.  (Tr. 341).

Ms. Quinn stated that she had not seen plaintiff since August 2003, as plaintiff had become suspicious that the head nurse of the clinic where Ms. Quinn works had been passing on medical information about plaintiff to the father of her baby.  (Tr. 341).

At the end of the report, Quinn indicated that plaintiff "remains easily frustrated, has difficulty getting along with others in a variety of settings, has difficulty accepting opinions that differ from hers, is highly suspicious and paranoid, displays distorted thinking, often impulsive, with limited insight and poor judgment."  (Tr. 342).  Quinn also indicated that she did not believe plaintiff was a good candidate for the work force.  (Tr. 342).  This report was provided to the Appeals Council for their consideration.

[15]    Ms. Quinn notes in her February 2002 assessment that plaintiff was seen at the Hamm Clinic in 1995 and 1996.  (Tr. 199).

From October 1997 to October 1999, plaintiff participated in individual and group counseling in Project ReCONNECT at the Amherst H. Wilder Foundation.  (Tr. 173-81). During this time period, plaintiff reported ongoing grief related to the termination of her parental rights or her oldest daughter.  (Tr. 173, 176, 178, 179).

On August 20, 2001, Marilyn Bronner, MSW, LICSW, performed a Diagnostic Assessment of plaintiff.  (Tr. 167).  Bronner reported that plaintiff had a depressed mood and had difficulty coping with every day life.  (Tr. 167).  Plaintiff lacked motivation, expressed the wish not to live, was irritable and had difficulty relating to people so she tended to isolate.  (Tr. 167).  Plaintiff stated that she avoids eye contact in public because she thinks people are looking at her.  (Tr. 167).  Bronner noted a remarkable change in plaintiff from when she saw her on December 11, 1998.  (Tr. 167).  At that time, plaintiff was very angry, but at this appointment she was much more sedate and was pleasant, cooperative, and open about her concerns.  (Tr. 167).  Bronner also noted that plaintiff had a stable place to live, living in the same apartment for six years. (Tr. 169).

On September 18, 2001, Dr. Robert Schneck performed a Psychiatric Diagnostic Assessment of plaintiff.  (Tr. 161).  Dr. Schneck noted that plaintiff reported that she was depressed, had trouble sleeping, was inactive, had no interest or enjoyments, felt isolated and had no social contacts.  (Tr. 161).  Plaintiff stated that she was able to take care of her children, but with difficulty.  (Tr. 161).  In regards to her mental status, Dr. Schneck observed that throughout the interview plaintiff cooperated and was subdued, but was tearful and sad at times; she made good eye contact; her speech was spontaneous, lucid, goal-directed, and delivered at length in monotone; her mood was depressed, but she denied suicidal ideation; her thinking was logical; and no

hallucinations or delusions were present.  (Tr. 163).  Plaintiff did report that people look

at her, but without evil intent, and that she avoids eye contact when she is in public.  Id.

Plaintiff was oriented times three, her intellectual functioning appeared in tact, and she

appeared to be of average intelligence.  Id.

On November 8, 2001, plaintiff filled out an Activities of Daily Living

Questionnaire in connection with her application for disability benefits.   (Tr. 99-105).

Plaintiff stated that before her impairments began, she tried to succeed in life; she was

not depressed or suicidal.  (Tr. 99).  Plaintiff also wore dress clothes, combed her hair

and wore make-up.  (Tr. 99).  However, after her impairments began, she became anti-

social, was afraid to go outside, could not find work, was paranoid, depressed, and cried

all the time, was sick of people, and not motivated to do anything.  (Tr. 99).  She

reported that she now bathes when she feels up to it.  (Tr. 99).

Plaintiff stated that she has lived in an apartment with her two children for six-

and-a-half years.  (Tr. 100).  Her oldest daughter was taken away from her and now is

adopted.  (Tr. 100).

Plaintiff described that on her typical day she gets the kids ready for school.  (Tr.

99).  She then watched television, cleans the house, and sleeps.  (Tr. 99).  She stated

that she has no friends and does not go outside.  (Tr. 99).  She also thinks about life.

(Tr. 99).  Plaintiff stated that she had no life before or after her impairments began.  (Tr.

100).  She has no hobbies.  (Tr. 100).

Plaintiff stated that she cooks for her children most of the time.  (Tr. 100).  She

cleans her house little by little and laundry is hard and stressful.  (Tr. 100).  She gets

tired quickly and only has the energy to take care of her place.  (Tr. 100).  Her mother

takes her shopping because she does not have a car and she either walks or takes the Healthride to her doctor appointments. (Tr. 100).

Plaintiff stated that she does not get along well with people because they stare too much at her. (Tr. 100). She stated that she is anti-social, she does not talk to anyone, she does not trust people, and people do not like her. (Tr. 100). She stated that even before her impairments began she was not a people person. (Tr. 100).

Plaintiff stated that she has no close friends or acquaintances. She stated that she participates in activities with some of her family members but she does nothing with other family members. (Tr. 101). Plaintiff also stated that she is afraid of police officers and that she does not talk to authority figures, and wants to be left alone. (Tr. 101).

Plaintiff stated that she does not like going out in public and she does not like groups. (Tr. 100). She does not like it when people look at her. (Tr. 100). She goes out as little as possible and when she does go out to the store, her mother goes with her. (Tr. 100).

Plaintiff stated that she is an alcoholic and that she drinks beer once per week, but does not get intoxicated. (Tr. 101). She stated that she was on probation for a DWI from June 2000 through November 2002. (Tr. 101). Plaintiff stated that she had blackouts and DTs when she was younger. (Tr. 101). She was fired for either going to work drunk or drinking at work. (Tr. 101). She stated that her family does not want her to use. (Tr. 101). She stated that she has attended treatment for her chemical dependency. (Tr. 103).

On the checklist contained in the Questionnaire, plaintiff stated that daily or more often she cooks, watches children, grooms herself, bathes, and talks on the phone (to her mother); she cleans her house weekly; and she shops, reads, visits relatives, talks

to neighbors, and pays bills and handles finances monthly.  (Tr. 102).  Plaintiff stated that she never drives, does yard work, fixes things, participates in clubs, organizations, attends church, plays cards or other games, attends sporting activities, visits friends, goes out to eat, takes classes or goes to school, or engages in exercise activities.  (Tr. 102).  Further, plaintiff has no hobbies and does not participate in other activities.  (Tr. 102).

Plaintiff stated that she has trouble walking and carrying things.  (Tr. 103).  She performs everything slowly, stating that it takes her all day to clean her house and she has trouble sticking to it.  (Tr. 103).  Plaintiff stated that she does a poor job shopping and will have to ask her mother to finish it for her.  (Tr. 103).  Plaintiff stated there were no activities in which she required supervision or special help in order to perform successfully.  (Tr. 103).

Plaintiff stated that she feels pressure and gets defensive when she goes outside.  She feels that people stare at her so she tells them to stop staring.  (Tr. 103).

Plaintiff stated that she took job classes, but her job search stopped because she was depressed and physically sick.  (Tr. 104).  She also stated that she has been through a lot in her life and that she does not feel normal.  (Tr. 104).

On November 20, 2001, plaintiff's mother filled out a questionnaire on plaintiff in connection with plaintiff's application for disability benefits.  (Tr. 107-110). Plaintiff's mother indicated that plaintiff gets herself up in the morning so she can send her daughter to school in the morning, she walks her daughter to the bus stop, then eats breakfast, cleans the house, gets her four-year-old daughter ready for pre-school and walks her to the bus stop, spends time with her children in the evening, and visits friends in the evening.  (Tr. 107).  With respect to plaintiff's daily activities, plaintiff's

mother indicated plaintiff cooks, cleans the house, bathes twice a day, talks on the phone, talks to neighbors, watches television, reads the Bible, watches her children, and sleeps 12 hours a day.  (Tr. 108).   Plaintiff's mother indicated that plaintiff gets along with her, that she likes groups, and that she is pleasant.  (Tr. 107).   However, plaintiff does not get along with authority.  Id.  Plaintiff's mother also noted that plaintiff gives up easily or denies having any problems.  Id.  Plaintiff has worked in the past, but she felt tired when she did.  (Tr. 110).

On November 21, 2001, plaintiff called Ramsey County Crisis and the police because plaintiff had thoughts of hitting her children.  (Tr. 171).   Plaintiff told the police that she had yelled at her five year old, was jealous of the child's teacher, and did not want to act on her thoughts.  (Tr. 171).   Plaintiff also reported mild suicide ideation. Plaintiff arranged for her sister to care for her children before she agreed to treatment at the Hewitt Crisis Residence.  (Tr. 171).   She was discharged because her sister could not care for her children.  (Tr. 171).

On November 13, 2001, plaintiff treated with Phyllis Parr, CFNP, for depression. Ms. Parr prescribed 20 mg of Prozac everyday.  (Tr. 207).   On November 27, 2001, plaintiff reported a slight improvement in her depression.  (Tr. 206).   Ms. Parr then prescribed 90 mg of Prozac weekly.  (Tr. 205).   On December 11, 2001, plaintiff reported feeling significant improvement, about 80%, with her depression.  (Tr. 204). On January 15, 2002, plaintiff told Ms. Parr that she felt 80% better now that she was taking 90 mg of Prozac weekly.  (Tr. 203).

On December 3, 2001, Kay Laurel Fischer, MA, LP, worked with plaintiff in Project ReCONNECT at the Wilder Foundation.  (Tr. 173).   Fischer noted that plaintiff worked hard to parent her two young children and that her children were appropriately

attached to her.  (Tr. 173).  Fischer also noted that plaintiff understood the children's developmental level, their ability to adjust to new situations, and their overall appearance related to hygiene and grooming.  (Tr. 173).  Fischer noted that plaintiff managed her parenting successfully, while encountering obstacles that made parenting difficult.  (Tr. 173).  Obstacles included single parenting, emotional, psychological and physical stress, no partner support (financial or emotional), no reliable transportation, childcare issues, limited financial resources, abusive men in her life and an unreliable family support system.  (Tr. 173).

On December 14, 2001, Dr. M. Gene Parrish performed a psychiatric evaluation of plaintiff.  (Tr. 182).  Dr. Parrish noted that plaintiff stated she had a nervous breakdown the day before Thanksgiving because her mother told her not to come to Thanksgiving dinner with the family.  (Tr. 182).  She called the crisis line and went to the Hewitt House.  (Tr. 185).  Plaintiff reported improved sleep and diminished crying spells with the use of Nortriptyline and Prozac  (Tr. 182).  Plaintiff complained of lack of energy and motivation, and stated that she did not want to be bothered by people.  Id.  Plaintiff did not answer Dr. Parrish's questions regarding plaintiff's concentration.  Id.  Plaintiff admitted that she had some anxiety, was easily annoyed, and had passive suicidal thoughts.  Id.  Plaintiff quantified her mood as 3 out of 10.  Id.  Dr. Parrish observed that plaintiff was dressed casually, but very neatly dressed and groomed and she wore jewelry.  He further observed that plaintiff was alert, appropriate, and her insight and judgment appeared to be intact.  Dr. Parrish noted that plaintiff's thought process was coherent, but not always forthcoming, and that her thought content evidenced no manic, psychotic, or paranoid symptoms.  (Tr. 185).

On January 10, 2002, State agency consultant, Dr. Patrick Shields, prepared a Mental Residual Functional Capacity Assessment on plaintiff.  (Tr. 232-49).  Dr. Shields stated:

> Claimant suffers from Depressive Disorder NOS, Dysthymic Disorder/R/O Major Depression, Marijuana and Alcohol Abuse, and Schizoid traits.  She has low motivation, and stays in and abuses marijuana and alcohol, despite having gone through treatment.  Nevertheless, the MER shows that her mental status is adequate for simple tasks.  She is able to care for her children, get them to school, maintain the same apartment the last six years, cook, clean, watch TV, and talk to neighbors daily.  She is partially credible, as her mother indicated that she tends to minimize her substance abuse.

(Tr. 234).

Based on these conclusions, Dr. Shields opined that plaintiff's mental RFC was as follows: (1) plaintiff retains the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with both detailed and complex instructions; (2) plaintiff's ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks; (3) plaintiff's ability to interact and get along with co-workers would be moderately impaired, but adequate for brief and superficial contact; (4) plaintiff's ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact; (5) plaintiff's ability to accept supervision would not be significantly impaired; (6) plaintiff's ability to sustain an ordinary routine without special supervision is not significantly impaired; and (7) plaintiff's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.  (Tr. 232-34).  Dr. Shields also rated plaintiff's functional limitations using the B Criteria from the Listing of Impairments.  He assessed mild limitations in restriction of activities of daily living, moderate limitations in

difficulties in maintaining social functioning and maintaining concentration, persistence, and pace, and one or two repeated episodes of decompensation, each of extended duration.  (Tr. 246).   Dr. Shields also stated in his report that plaintiff has sporadic mental health contacts, and changed treating sources often if anyone disagreed with her or recommended treatment.  (Tr. 248).  Dr. Shields also noted that plaintiff was able to live independently and care for her children, shop, and see her family.  Id. On April 2, 2002, a state agency physician indicated that she had reviewed all the evidence in the file, and affirmed Dr. Shield's assessment.  (Tr. 232).

On March 4, 2002, Ms. Quinn noted that plaintiff was highly reactive to others and was suspicious and defensive.  (Tr. 301).  Plaintiff also noted during that session that women in her Job Training Course are negative and worse off than her.  (Tr. 301).  On March 12, 2002, plaintiff called Ms. Quinn because she was upset because her five-year-old daughter had been sent home from school with a note regarding her daughter's behavior at school.  (Tr. 303).  Plaintiff did not send her child to school the next day because she wanted to get more information about what happened.  (Tr. 303).  On March 27, 2002, Ms. Quinn noted that she noticed a significant difference in plaintiff's ability to manage stress and that plaintiff was feeling calmer.  (Tr. 299).   On April 12, 2002, plaintiff's probation officer called Ms. Quinn and noted that plaintiff had refused to cooperate in her treatment in the community and that she had concerns of plaintiff's cannabis use.  (Tr. 298).

On May 3, 2002, Ms. Quinn noted that plaintiff had her children taken away from her for the weekend unexpectedly by Child Protection.  (Tr. 290, 292-94).  Plaintiff remained calm throughout, and did not resort to negative behaviors.  (Tr. 290).  Ms. Quinn received a call from Child Protection and she told them that she did not know

plaintiff to be physically or emotionally abusive to her children, and that plaintiff was irritable and yelled at her children, but those incidents decreased once plaintiff was on Prozac.  (Tr. 292, 295).

On May 15, 2002 and on July 1, 2002, plaintiff failed to show for her appoint with Ms. Quinn, but Ms. Quinn was unaware if she had called to cancel or not.  (Tr. 286).  On June 18, 2002, plaintiff called to cancel her appointment with Ms. Quinn.  On August 21, 2002, Ms. Quinn noted that plaintiff remains highly suspicious and paranoid, but that she is less reactive and has fewer angry outbursts.  (Tr. 282).  On September 9, 2002, Ms. Quinn noted that plaintiff was remaining calm during her eviction.  (Tr. 279).  On September 11, 2002, Ms. Quinn received a call from plaintiff's probation officer informing her that she had received a call from plaintiff's mother regarding her concerns that plaintiff was drinking every day and taking her anger out on her children.  Ms. Quinn noted that she was not under the impression that plaintiff was drinking every day, was less sure about plaintiff's anger, but was under the impression that plaintiff had not been physically abusive to her children.  (Tr. 280).  On October 8, 2002, Ms. Quinn noted that plaintiff was remaining calm while she was adjusting to being pregnant.  (Tr. 277).  October 22, 2002, Ms. Quinn noted that plaintiff was praying with Jehovah Witnesses.  (Tr. 276, 299).

On January 2, 2003, plaintiff indicated to Ms. Quinn that she had been living in a shelter since December 23, 2002 when her mother kicked them out of the house.  (Tr. 338).  On February 4, 2003, plaintiff indicated that she moved in with her mother for eleven days but that it blew up and the police were called.  (Tr. 334).  On February 13, 2003, plaintiff stated to Ms. Quinn that she thought about putting her two children in foster care temporarily because she felt overwhelmed.  (Tr. 333).  On February 20,

2003, Ms. Quinn noted that plaintiff was highly suspicious of the other women at the shelter and felt that they gossiped about her and did not like her. (Tr. 330). On February 27, 2003, Ms. Quinn noted that plaintiff was suspicious of her first child's adoptive mother, which Ms. Quinn noted was indicative of plaintiff's distorted thinking and lack of trust. (Tr. 329). On March 3, 2003, Ms. Quinn noted that plaintiff did not trust people at the shelter and became defensive easily and got into conflicts there. (Tr. 327). On March 24, 2003, Ms. Quinn reported that plaintiff struggles at the shelter and is paranoid of other women. (Tr. 323). Plaintiff also expressed concerns about how she would house and feed three children. (Tr. 323). On April 7, 2003, Ms. Quinn noted that plaintiff seemed fatigued and discouraged about housing. (Tr. 320). Ms. Quinn also noted that plaintiff displayed poor judgment and black-and-white thinking. (Tr. 321). On April 29, 2003, Ms. Quinn noted that plaintiff seemed quite calm. (Tr. 319).

On June 4, 2003, plaintiff made a scene at the clinic when she was turned down for the medications she previously received before she became pregnant. (Tr. 316-17). On July 31, 2003, Ms. Quinn stated that plaintiff was highly distraught and displayed rigid and obsessive thinking. (Tr. 313). Plaintiff was quite upset because plaintiff was convinced that a nurse at United Family Practice Center treated her unfairly and breached confidentiality due to a relationship they both have with the father of plaintiff's baby. (Tr. 312). On August 11, 2003, Ms. Quinn reported that plaintiff's level of functioning was fair and that plaintiff was calm during the session and did not seem to get rattled easily by her children. (Tr. 311).

Finally, the record contains the testimony of plaintiff and Dr. Hoberman, both who testified at the hearing. (Tr. 388).

Plaintiff testified as follows: She and her two children had been homeless since October 31, 2002 and that she and her children just moved back in with plaintiff's mother. (Tr. 359). Plaintiff's her current source of income was INFEP. (Tr. 360).

Plaintiff was living with her mother because she was attacked and assaulted when she invited people into her house for a gathering. (Tr. 373). According to plaintiff, a woman got loud and rude with her and she started fighting with plaintiff. (Tr. 373). The woman stabbed plaintiff with a fork causing plaintiff to go to the emergency room to get 17 stitches. (Tr. 373). Plaintiff was taken to jail pending an investigation, but was not charged in the incident. (Tr. 373-74). Plaintiff's landlord evicted her because the incident happened on the property and the woman who assaulted plaintiff was considered her guest. (Tr. 374).

Plaintiff testified that she completed the twelfth grade, but she had no other vocational training beyond that. (Tr. 360). She stated that she could not work a full-time job because she suffers from "depression and anxiety and child issues—trauma and stuff like that and it's hard for me to be around people." (Tr. 361). Also, working causes her to become overwhelmed with anxiety and it is hard for her. (Tr. 361). This has been a problem for her all her life and she is seeing a psychologist, Louise Quinn, on an ongoing basis for treatment. (Tr. 361).

Plaintiff testified that she has taken Prozac for about a year, but had been on and off of it for three years. (Tr. 362). When she was off Prozac, things were worse for her because it was difficult for her to stay focused and feel comfortable in places. (Tr. 362). She suffers no side effects from Prozac; she feels relaxed when she takes it. (Tr. 362). Plaintiff also testified that Prozac makes her feel okay with herself when she is in public, grocery shopping, and around people. (Tr. 382).

During the day, plaintiff tries to find housing for her family, which allows her no time to watch television.  (Tr. 362, 380-81).  She lived in subsidized housing for seven-and-a half-years and she is trying to get that back.  (Tr. 362).  She wanted to find a stable and permanent home because her family is not dependable.  (Tr. 362-63).

Plaintiff testified that her children go to school and when they are not in school, she cares for them.  (Tr. 363).  She gets them ready for school at about 7:00 a.m.  (Tr. 380).  The children return home at about 4:00 p.m. and plaintiff fixes their meal.  (Tr. 380).  Plaintiff then does homework with her children.  (Tr. 381).  The children go to bed about 8:00 p.m.  (Tr. 381).   She does other things with them like take them to the Children's Museum.  (Tr. 365).  Plaintiff does not drive because her driver's license was revoked due to a DWI in 2000.  (Tr. 363).

Plaintiff testified that she keeps her mother's house clean.  (Tr. 364).  She cleans up after her children, does the dishes, vacuums, and does whatever she can to help out and keep her mother happy.  (Tr. 364).  She also does the laundry, cooking, and grocery shopping, but stated that those activities are difficult for her because she is a single parent.  (Tr. 364-65).

Plaintiff rides the city bus, but she does not like it because she feels anxious and nervous and that people are looking at her.  (Tr. 372).  Plaintiff testified that she thinks people are always looking at her wherever she is.  (Tr. 373).

Plaintiff testified that she is able to maintain general medical care and that she goes to her doctors regularly for different things.  (Tr. 382).  She also meets with Ms. Quinn twice a month to work on plaintiff's mental health issues.  (Tr. 379).

Plaintiff does not attend AA or NA.  (Tr. 364).  The last time she used alcohol or an illicit drug was in August 2002 when she drank four or five beers and smoked a joint of marijuana.  (Tr. 364).

Plaintiff testified that she has no friends and that her family is not dependable. Her family members suffer from depression and alcoholism.  (Tr. 365, 377).

Plaintiff testified that she has had no suicidal attempts in the last couple years; however, she admitted to having suicidal thoughts.  (Tr. 378).  She has been able to resist attempting suicide because she has sought help.  (Tr. 378).

Plaintiff attended job-training courses through the Aspire Program.  (Tr. 365). She missed three days of the program and was late a few times.  (Tr. 378).  Plaintiff was late or missed the program due to getting her children ready for school in the morning or because they missed the bus.  (Tr. 379).  She was referred to Saint Bart Rehabilitation, but has not started there yet.  (Tr. 365-66).

Plaintiff testified that besides the DWI, she had a misdemeanor malicious punishment of a child in 1995, which led to the termination of parental rights to her oldest daughter.  (Tr. 367).

Plaintiff has difficulty sleeping because she has nightmares four times a week, approximately four times a night, about dying or that Satan is after her.  (Tr. 371-72). Plaintiff sleeps with her Bible and when she has a nightmare she prays.  (Tr. 372).

Dr. Hoberman testified, after reviewing the record as a whole, that plaintiff had a mild degree of limitation in restrictions of activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulties in the areas of concentration, persistence, and pace, and at least one period of decompensation that related to her substance abuse.  (Tr. 388).

Dr. Hoberman further testified that, in his opinion, plaintiff could concentrate on, understand, and remember work-like procedures for short, simple instructions, and that plaintiff has the ability to carry out tasks with adequate persistence and pace for three to four step tasks. (Tr. 389). Dr. Hoberman also stated that there is no evidence that plaintiff had difficulties coping with supervision. (Tr. 389). Dr. Hoberman opined that plaintiff has the ability to maintain attendance at a work setting. (Tr. 389). Dr. Hoberman also opined that plaintiff has the capacity to tolerate stress typically found in three to four step work settings. (Tr. 389). Dr. Hoberman indicated that he would place certain limitations on plaintiff due to her suspiciousness of other people and discomfort with others. (Tr. 389). In that regard, Dr. Hoberman stated he would limit plaintiff to brief, superficial contact with co-workers and the general public. (Tr. 389).

**D.    Court's Review of Record as Whole**

Based on this Court's review of the record as a whole, this Court finds substantial evidence in the record as a whole to support the ALJ's conclusion that the combination of the plaintiff's impairments resulted only in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and one episode of decompensation related to the claimant's substance abuse, and that therefore, plaintiff's impairments did not meet, or medically equal, singularly, or in combination, any listed impairments of the Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4.

**1.    Activities of Daily Living**

"Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and

using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(1). The qualities of these activities are assessed by their independence, appropriateness, effectiveness, and sustainability. Id. As noted earlier, a "marked" limitation means "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Id.

Here, the record reflects from numerous sources that plaintiff cooks, maintained her own apartment for 6 years, cleans her apartment, cares for her children, bathes regularly, reads, talks to neighbors, used public transportation, and dressed neatly and was well groomed. (Tr. 99-102, 107-08, 169, 173, 364-65, 380-81). Plaintiff's mother indicated that plaintiff gets along with her, that plaintiff likes groups, and that she is pleasant. (Tr. 107).

While the record also reflects that plaintiff lost her housing for a limited period of time in late 2002 due to a fight at her apartment, was removed from a shelter due to personality conflicts with other residents, and was not particularly comfortable taking public transportation, overall, these infrequent events do not suggest a serious problem with plaintiff's ability to function independently, appropriately, effectively, and on a sustained basis.

Based on all of the facts, the Court finds that the record supports the ALJ's finding that plaintiff was no more than mildly limited in activities of daily living.

### 2.    Social Functioning

The regulations define "social functioning" as follows:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(2).

The ALJ found that that plaintiff was only moderately impaired in her social functioning, rejecting Ms. Quinn's opinion that plaintiff had "extreme" limitations on social functioning.

Plaintiff argues that ALJ's finding on social functioning is not supported by the record, pointing to her difficulties in maintaining any effective male relationships, several unplanned pregnancies, inability to identify all of her children's fathers, abuse by sexual partners, screening for sexually transmitted diseases, lack of emotional or financial help from any of the fathers, and difficulty in maintaining close friends and family relationships.  (Tr. 163, 169, 185, 195, 198, 203, 255, 280-81, 283, 292, 304).

Further, plaintiff focuses on the fact that she had had unpleasant encounters with her physicians, on two occasions she had kept her child from school because another child had died of an asthma attack and because a teacher sent a note home with plaintiff's child indicating the child had misbehaved, and she had inappropriately brought her children with her to therapy without bringing activities to entertain them.  (Tr. 271, 299, 301, 303-04, 312, 317, 330, 341, 372).  According to plaintiff, the fact that she even

sleeps with the Bible under her pillow to ward off Satan is further evidence of her inability to function in an appropriate social manner. (Tr. 372).

However, the record indicates that, up until the September 11th attack, plaintiff had socialized with people in her apartment complex, used public transportation, was generally pleasant and cooperative with medical professionals, got along well with her children, spent time with family, talked on the phone, visited friends, and likes groups. (Tr. 102, 107, 167, 173, 197).

The record also indicates that plaintiff remained calmer in the face of difficult situations. For example, on March 27, 2002, Ms. Quinn noted that she noticed a significant difference in plaintiff's ability to manage stress and that plaintiff was feeling calmer. (Tr. 299). On May 3, 2002, Ms. Quinn noted that plaintiff had her children taken away from her for the weekend unexpectedly by Child Protection, but that plaintiff remained calm throughout, and did not resort to negative behaviors. (Tr. 290, 292-94). On August 21, 2002, Ms. Quinn noted that while plaintiff remained highly suspicious and paranoid, she was less reactive and has fewer angry outbursts. (Tr. 282). On September 9, 2002, Ms. Quinn noted that plaintiff was remaining calm during her eviction. (Tr. 279). On October 8, 2002, Ms. Quinn noted that plaintiff was remaining calm while she was adjusting to being pregnant. (Tr. 277). Further, Ms. Quinn indicated that plaintiff's abilities were fair in her ability to work in coordination with or proximity with others without being unduly distracted and to deal with normal work stress. (Tr. 306-307). And as the ME noted, there was a lack of reference in her records to difficulties with schools, doctors, or social services. (Tr. 390-91)

There is no question that plaintiff's ability to interact independently, appropriately, effectively, and on a sustained basis with other individuals is impaired. However, in

reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Woolf, 3 F.3d at 1213. "It is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner. In this regard, I 'must consider both evidence that supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision.'" Callison v. Callahan, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (citations omitted). See also Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (concluding that, "if substantial evidence supports the Secretary's position then it must be upheld" because the "Secretary has 'zone of choice' within which to operate") (quoting Steele v. Sullivan, 911 F.2d 115, 116 (8th Cir. 1990)). Where, unlike Ms. Quinn, the ME and the ALJ, had the benefit of the entire record to consider in making their determination on social function, this Court cannot say that there is not substantial evidence to support the ALJ's decision. Therefore, based on these facts, the Court finds that the record supports the ALJ's finding that plaintiff was no more than moderately limited in her social functioning.

### 3.    Concentration, Persistence, or Pace

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(3). In addition, the regulations state:

> Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

42

Id.

The ALJ found that plaintiff was moderately limited in concentration, persistence, or pace.  She based that finding on the fact that plaintiff had been able to seek out medical help when she needed it, had made the most of her mental health appointments, and that the file contains no evidence that shows that plaintiff was unable to attend to her children's needs when they resided with her.  (Tr. 24).  In addition, the record reflects that when assessing plaintiff's mental abilities and aptitude needed to do unskilled work, Ms. Quinn rated plaintiff's abilities as "Good" to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two-hour segments, and perform at a consistent pace  without an unreasonable number and length of rest periods.  (Tr. 306-07)  Similarly, the State agency consultant, Dr. Shields, concluded upon review of plaintiff's records, plaintiff retained the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with both detailed and complex instructions; and her ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks.  (TR. 234).  Finally, the record also indicates that plaintiff managed her parenting successfully, while encountering obstacles that made parenting difficult.  (Tr. 173, 248).

Based on these facts, the Court finds that the record as a whole supports the ALJ's finding that plaintiff was no more than moderately limited in concentration, persistence, or pace.

### C.    The Hypothetical Questions Posed to the Vocational Expert ("VE")

"Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence."   Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

While a hypothetical must accurately set forth all of the claimant's impairments, the question need only include those limitations accepted by the ALJ as true.  Rappaport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).

Plaintiff contends that the sole hypothetical posed to the VE by the ALJ assumed that plaintiff was only moderately impaired as a result of her significant mental impairments and would be capable of handling the stress of simple jobs, responding appropriately to supervisors, attending work on a regular basis without mental health symptom interruptions, and meeting the demands of simple and unskilled work. Plaintiff's Mem., at 19.  Plaintiff further contends that the sole basis for these restrictions was the opinion of the ME that directly contradicted the opinion of plaintiff's treating psychologist.  Id.  Plaintiff argues that because that hypothetical was not based on substantial evidence and did not include a realistic assessment of the mental health limitations suffered by plaintiff, it was legally insufficient.  Id.  Therefore, plaintiff concludes, the opinion of the VE that plaintiff could perform her past work and other competitive employment was not supported by substantial evidence and cannot support a denial of benefits.  Id.  Plaintiff urges this Court to adopt the opinion of the VE, in response to questioning by her counsel, that plaintiff's limitations as detailed by Ms. Quinn would preclude performance by plaintiff of her past work or of any other work in the national economy.  Id.

As explained above, the ALJ engaged in a proper evaluation of the medical evidence and of part B of the listing criteria.  Accordingly, the Court finds plaintiff's contention to be without merit.  The ALJ formulated a proper RFC, based on substantial medical evidence, and presented it in a proper form to the VE.  The ALJ was within her purview to reject any proposed additional limitation.  Rappaport, 942 F.2d at 1323.  A

review of this matter shows that the ultimate finding of the ALJ, that plaintiff is not disabled because she retains the RFC to perform her past relevant work as a housekeeper and bathroom attendant, as well as a significant number of additional jobs, is supported by substantial evidence on the record as a whole.  See Wilson, 886 F.2d at 175.

## V.    **RECOMMENDATION**

For the reasons set forth above, this Court finds that the decision by the ALJ to deny plaintiff disability benefits is supported by substantial evidence on the record as a whole.

Therefore, it is recommended that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 12] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 19] be **GRANTED**.

Dated:  March 9, 2005

*s/ Janie S. Mayeron*
JANIE S. MAYERON
U.S. Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **March 28, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.